IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **CAPITAL CITY ENERGY** | : | |
| **GROUP, INC., et al.,** | : | **Case No. 2:11-CV-00207** |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **KELLEY DRYE & WARREN,** | : | **Magistrate Judge Norah McCann King** |
| **LLP, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter is before the Court on Plaintiffs Capital City Energy Group, Inc.'s ("CCEG")

and Hotwell Services, Inc.'s ("Hotwell") (collectively "Plaintiffs") Motion for Summary

Judgment, (Doc. 62), and Defendants Kelley Drye & Warren LLP's ("Kelley Drye") and

Timothy R. Lavender's ("Lavender") (collectively "Defendants") Motion for Summary

Judgment, (Doc. 66). For the reasons set forth herein, Plaintiffs' Motion is **DENIED** and

Defendants' Motion is **GRANTED** in part and **DENIED** in part.

### I. BACKGROUND

*A. Factual Background*

Defendants Kelley Drye & Warren LLP and Timothy R. Lavender, an attorney in Kelley

Drye's Chicago office, provided legal services to Plaintiff Capital City Energy Group, Inc.

("CCEG"), its wholly-owned subsidiary, Plaintiff Hotwell Services, Inc. ("Hotwell"), and certain

of CCEG's other affiliated companies for approximately four years. From April 2008 through

January 2010, Plaintiffs and their affiliates accumulated $713,866 in unpaid legal fees and

expenses owed to Kelley Drye. (*Lavender Decl.*, Doc. 65-1, ¶ 54.) Plaintiffs' action alleges legal

malpractice with respect Lavender's legal representation in five distinct transactions: 1) the

Hotwell Transaction; 2) the Meridian Transaction; 3) The Lazear Capital Transaction; 4) the

Sites Release Agreement; and 5) the CCEG Share Acquisition.

1. The Hotwell Transaction

Plaintiff's first malpractice claim concerns Lavender's representation of CCEG in

drafting a merger agreement relating to CCEG's acquisition of Hotwell in December 2008 (the

"Hotwell Transaction").  CCEG alleges that, subsequent to the closing of the Hotwell merger, it

discovered that Hotwell had substantially more liabilities than it had disclosed in the financial

statements that were included as part of the Merger Agreement. The parties dispute the existence

of the alleged financial inaccuracies. The former chief executive officer of CCEG, Tim

Crawford, and the company's current chairman of the board, Todd Crawford, have both testified

that they believe these financial inaccuracies were the result of fraud on the part of the Hotwell

sellers. (*Tim Crawford Depo*. Doc. 60-1, 160-62; *Todd Crawford Depo*., Doc. 60-5, 64.)

CCEG contends Lavender committed malpractice because he failed to include provisions

in the Merger Agreement that would protect CCEG against losses arising from the alleged

inaccuracies in Hotwell's financial statements. According to CCEG, Lavender should have

included "unwind" and/or "clawback" provisions in the Merger Agreement.

Defendants argue that no duty of care was breached because Lavender included in the

Merger Agreement provisions that provided CCEG with the same amount of protection as the

"clawback" and "unwind" provisions CCEG has identified.  In particular, Defendants present

evidence that the Merger Agreement included: 1) express representations and warranties by the

sellers regarding the accuracy of their disclosures about the financial condition of Hotwell; 2)

provisions obligating the Hotwell sellers to indemnify CCEG for all losses up to $5 million (i.e.

the purchase price) arising from any breach by the sellers of their representations and warranties;

2

and, 3) removal of the $5 million cap (so that there was no limit to CCEG's recovery) if the Hotwell sellers fraudulently misrepresented the financial condition of Hotwell. (*Lavender Decl*., Doc. 65-1, ¶¶ 19-20; *Merger Agreement*, Doc. 65-7.) Defendants contend that these indemnity provisions completely protected CCEG from any material inaccuracies regarding Hotwell's financial condition. Defendants further argue that the absence of "unwind" or "clawback" provisions did not cause any proximate damages to CCEG.

<u>2. The Meridian Transaction</u>

Plaintiffs' second malpractice claim concerns Lavender's representation of CCEG with respect to its execution of an assignment agreement, promissory note, and security agreement in favor of Meridian Capital Ventures in June and July 2009 (the "Meridian Transaction").

CCEG engaged Capital City Consulting Group ("Consulting Group") to provide investment banking services in connection with the Hotwell merger. (*Lavender Decl*., Doc. 65-1, ¶ 10.) Consulting Group, in turn, subcontracted with John Geraci and his company, Meridian Capital Ventures LLC ("Meridian"), to assist Consulting Group in providing investment banking services to CCEG. (*Id*.) Consulting Group billed $307,306 to CCEG for its services. Meridian billed $193,000 to Consulting Group for its services. (*Id*. at ¶ 25.)

In June 2009, CCEG, Consulting Group, and Meridian executed an assignment agreement – drafted by Lavender – pursuant to which they agreed as follows: (1) Consulting Group assigned to Meridian $175,000 of the amount Consulting Group was owed by CCEG; and (2) Meridian accepted the $175,000 assignment in full satisfaction of the amount owed to it by Consulting Group (the "Assignment Agreement"). (*Id*. at ¶¶ 26, 28.) After this transaction was completed, CCEG owed $175,000 to Meridian instead of owing that amount to Consulting Group. (*Id*.) In addition to the $175,000 assignment, CCEG also owed $37,500 to Meridian for

consulting services Meridian had provided directly to CCEG on other transactions. (*Id.* at ¶ 30.)

Thus, after the Assignment Agreement was executed, CCEG owed Meridian a total of $212,500.

(*Id.*)

On July 7, 2009, CCEG gave Meridian a promissory note for $212,500, and also

executed a security agreement under which the note was secured by an interest in all of the assets

of CCEG and a subsidiary, Capital City Petroleum, Inc. ("Capital City Petroleum"). (*Lavender*

*Depo.*, Doc. 61, 269; *Assignment Agreement*, Doc. 61-43; *Secured Promissory Note*, Doc. 61-44;

*Security Agreement*, Doc. 61-45.) These documents were also drafted by Lavender.  Defendants

present evidence that Meridian was given this security interest in exchange for an agreement to

forebear its right to collect the debt amount immediately.

CCEG alleges that, as a result of the execution of these documents, CCEG and Capital

City Petroleum became liable to Meridian for a debt they otherwise would not have owed, and

for which they received nothing in return. Defendants counter no additional debts were incurred

through these transactions and that Lavender explained to CCEG board members that the

security agreement would give Meridian the right to foreclose on CCEG and Capital Petroleum

assets.

Defendants further assert that, upon receiving the promissory note and security

agreement, Meridian honored its agreement to forbear its right to collect the debt by giving

CCEG an additional eight months to generate the funds needed for repayment. (*Lavender Decl.*,

Doc. 65-1, ¶ 36.) When CCEG failed to pay down any portion of the debt during that time,

Meridian filed suit on May 20, 2010, to enforce the promissory note. (*Mead Decl.*, Doc. 63-1,

Ex. 1.)[1] Meridian's suit contained no claim to enforce the security agreement, (*id*.), and, to date, Meridian has not taken any steps to foreclose on the secured assets. (*Lavender Decl*., Doc. 65-1, ¶ 36.)

3. The Lazear Transaction

Plaintiffs' third malpractice claim concerns Lavender's representation of CCEG and Hotwell in negotiating and drafting a security agreement as part of a loan transaction with Lazear Capital Partners, LLC ("Lazear Capital") in September 2009 (the "Lazear Capital Transaction"). As of September 2009, Hotwell was experiencing severe cash flow problems and needed approximately $175,000 to stay in business. CCEG decided to sell Hotwell, but looked for an investor to advance Hotwell the funds necessary to meet its payment obligations while CCEG identified a buyer and finalized the terms of a sale. (*Lavender Decl*., Doc. 65-1, ¶ 38; *Doug Crawford Decl*., Doc. 64-1, ¶ 13.)

On September 15, 2009, Hotwell executed a letter of intent with Lazear Capital, pursuant to which the parties committed to negotiate with one another, on an exclusive basis, concerning Lazear Capital's acquisition of Hotwell's assets. (*Lavender Decl*., Doc. 65-1, ¶ 39; *Doug Crawford Decl*., Doc. 64-1, ¶ 14.) At the same time, Lazear Capital extended Hotwell a $1 million line of credit. As security for the loan, Hotwell executed a security agreement, pursuant to which Hotwell pledged all of its personal property assets as collateral. (*Lavender Decl*., Doc. 65-1, ¶ 39.) Lavender drafted the relevant agreements.

As of October 28, 2009, Lazear Capital had loaned Hotwell more than $640,000 on the line of credit, which has not been repaid in any portion. The parties had not yet closed on Lazear Capital's purchase of Hotwell. On that date, Lazear Capital made a written demand for payment

---

[1] On August 30, 2011, CCEG and Meridian reached a settlement by which CCEG stipulated to entry of judgment against it in the full amount of the promissory note plus accrued interest. (*Mead Decl*., Doc. 63-1, Ex. 2.) The judgment also states that Meridian may execute on the judgment immediately. (*Id*.)

of the outstanding balance owed on the line of credit. Hotwell failed to pay within the time

provided, and Lazear Capital sent a second letter to Hotwell, on November 3, 2009, notifying it

that Lazear Capital intended to conduct a private sale of Hotwell's assets in satisfaction of its

outstanding debt. Lazear Capital indicated it would conduct the sale sometime after November

10, 2009. (*Id*. at ¶ 40; Doug Crawford Decl., Doc. 64-1, ¶¶ 22-24.)

Upon receiving the notice of private sale, Doug Crawford, CCEG's current CEO,

contacted Lavender to discuss the matter. Lavender told Doug Crawford that Lavender was not

licensed to practice law in Ohio, and thus could not advise CCEG or Hotwell regarding the

validity of Lazear Capital's proposed private sale, nor represent CCEG or Hotwell in any legal

action in Ohio to challenge it. Lavender suggested that Crawford consult an Ohio attorney

regarding these matters. (*Lavender Decl*., Doc. 65-1, ¶ 41; *Doug Crawford Decl*., Doc. 64-1, ¶

25.) Doug Crawford avers that he "never asked or directed Mr. Lavender or any other attorney to

take any type of legal action on behalf of CCEG or Hotwell to challenge Lazear's private sale of

Hotwell's assets, either before the sale or afterward." (*Doug Crawford Decl*., Doc. 64-1, ¶ 28.)

On December 3, 2009, Lazear Capital gave notice to Hotwell that it had conducted a

private sale of Hotwell's assets that morning and had acquired all of those assets in satisfaction

of its outstanding debt. (*Lavender Decl*., Doc. 65-1, ¶ 42; *Doug Crawford Decl.*, Doc. 64-1, ¶

27.) Subsequently, Hotwell reached a settlement with Lazear Capital, pursuant to which Hotwell

reacquired its assets in exchange for payment of $1.3 million. (*Todd Crawford Depo*., Doc. 60-5,

196-97.)

Plaintiffs assert that Lavender breached his duty of care by failing to include a provision

in the Lazear security agreement prohibiting Lazear from conducting a private sale of the secured

assets.  Defendants argue that there was no need for Lavender to include this type of provision

because Ohio's UCC prohibited Lazear from conducting a private sale of Hotwell's assets, irrespective of what the agreement said. Defendants further argue that the absence of a contractual provision precluding private sale of Hotwell's assets did not proximately cause Plaintiffs any damages.

### 4. The Sites Release Agreement

Plaintiffs' fourth malpractice claim concerns Lavender's representation of Plaintiffs in January 2010 with respect to their agreement with Hotwell's president, Joseph Sites, releasing Sites from his employment agreement (the "Sites Release Agreement"). On December 31, 2008, contemporaneously with the Hotwell merger, CCEG and Hotwell entered into an employment agreement with Sites. (*Lavender Decl*., Doc. 65-1, ¶ 43; *Doug Crawford Decl*., Doc. 64-1, ¶ 6.)

The Sites employment agreement contained certain restrictive covenants that limited Sites' ability to work for CGEG/Hotwell competitors following the termination of his employment with Hotwell. Plaintiffs allege that a drafting error occurred in Section 6(c), which essentially created a loophole whereby Sites would not be bound by the restrictive covenants were he to resign, rather than being terminated for cause. (*Lavender Depo*. Doc. 61-1, 255-56.)

On January 22, 2010, Doug Crawford released Sites from his employment agreement on the basis that CCEG had not met certain obligations in the employment agreement, including: 1) paying certain bonus monies owed to Sites from 2008; 2) reimbursing certain expenses; 3) and repaying a personal loan from Sites to Hotwell. (*Id*. at 256-57, *Sites Email Corresp*., Doc. 61-38.) CCEG's decision to release Sites from the non-compete portion of his employment agreement was based on Lavender's advice. (*Lavender Depo*., Doc. 61-1, 257.)  In Plaintiffs' view, this had the effect of allowing Sites – who had vast knowledge and contacts throughout the

oil and gas industry and was arguably Hotwell's most valuable employee – to go straight to work for a competitor.

Plaintiffs' expert acknowledges that Lavender gave the correct advice as to the effect of a material breach by CCEG on the enforceability of the restrictive covenants in Sites' employment agreement. Plaintiffs assert however, that it was unclear whether CCEG had in fact materially breached the agreement. Defendants contend that CCEG's failure to pay Sites bonuses, certain expenses, and monies owed from a loan did in fact constitute an unambiguous material breach of contract.

5. The CCEG Share Acquisition

Plaintiff's fifth malpractice claim concerns Lavender's acquisition of 100,000 shares of CCEG common stock in May 2008, while he was serving as the company's legal counsel (the "CCEG Share Acquisition"). (*Lavender Depo*., Doc. 61-1, 36.) As of the date of receipt, May 20, 2008, the shares were worth approximately $275,000. They were not purchased from a broker, but rather a stock certificate was issued directly to Lavender by CCEG's corporate secretary. (*Lavender Decl*., Doc. 65-1, ¶ 51.) The shares at issue were restricted under federal securities law, such that Lavender was prohibited from selling them.

Lavender testified in his deposition that he had proposed to pay for these shares by paying certain filing fees that are charged to public companies by the SEC. (*Lavender Depo*., Doc. 61-1, 37.) Ultimately, no such payments were made. (*Id*.)

Lavender asserts that, prior to acquiring the CCEG shares, he had a telephone conversation about his receipt of the shares with a managing partner of Kelly Drye, who approved the acquisition. (*Id*. at 38.) Plaintiffs allege, however, that no other person at Kelley Drye was aware of Lavender's interest in CCEG until 2009. (*Id*. at 43.) On May 6, 2009, after

then-former CCEG CEO Timothy Crawford raised the issue to Tom Ferguson of Kelley Drye, Lavender returned the stock certificate to CCEG's corporate secretary and directed that she cancel the shares as of the date they were originally issued in 2008. (*Id*.; *Lavender Decl*., Doc. 65-1, ¶¶ 51-52). CCEG corporate records show that the shares were cancelled effective May 8, 2009. *Lavender Decl*., Doc. 65-1, ¶ 51.)

Plaintiffs assert that Lavender's acquisition of $275,000 worth of CCEG stock failed to comply with Rule 1.8(a) of the Ohio Rules of Professional Conduct, which proscribes a lawyer from engaging in business with a client except in limited circumstances. In particular, Plaintiffs contend that Lavender failed to comply with the necessary procedural protections (e.g., written notice, informed consent, etc.) and, in effect, accepted what amounted to a gift of CCEG stock. Defendants argue that there is no evidence that Lavender's ownership of those shares caused him to breach his standard of care as an attorney on any transaction for which he was representing CCEG or Hotwell.

### B. Procedural Background

On January 31, 2011, Plaintiffs brought this action for legal malpractice in the Franklin County Court of Common Pleas. In their Complaint, (Doc. 3), Plaintiffs asserted claims against Kelley Drye and Lavender, based on Lavender's legal representation in five transactions: 1) the Hotwell Transaction; 2) the Meridian Transaction; 3) The Lazear Capital Transaction; 4) the Sites Release Agreement; and 5) the CCEG Share Acquisition. On March 7, 2011, Defendants removed to this Court. (Doc. 1.)

Plaintiffs moved for Summary Judgment as to their malpractice claims relating to the Meridian Transaction, the Sites Release Agreement, and the CCEG Share Acquisition only. (Doc. 62.) Defendants moved for summary judgment as to all of Plaintiffs' claims. (Doc. 66.)

The Court heard oral argument on the parties' respective motions, and the matters are now ripe for review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

In determining whether summary judgment is appropriate, the necessary inquiry is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). Summary judgment "will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  To survive such a motion, however, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The suggestion of a mere possibility of a factual dispute is insufficient to defeat a movant's motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).  In assessing whether summary judgment is

proper, the Court views evidence in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

### III. LAW AND ANALYSIS

*A. Plaintiffs' Motion for Summary Judgment*

Plaintiffs seek summary judgment on their malpractice claims as they relate to three transactions for which Defendants did not offer a rebuttal expert opinion: 1) The Meridian Transaction; 2) the Sites Release Agreement; and 3) the CCEG Share Acquisition.  Each of these three transactions was reviewed by Plaintiffs' expert, Attorney Nelson Genshaft ("Genshaft"), who found that Lavender failed to meet the standard of care required of an attorney practicing in Ohio.  Defendants' expert did not address Genshaft's conclusions as to these transactions. Therefore, Plaintiffs assert that they are entitled to summary judgment as to their malpractice claims arising from those transactions. Defendants argue that they are not required to present a rebuttal expert as to these transactions and instead plan to refute Genshaft's opinion evidence through cross-examination and evidence that, in their view, contradicts the key assumptions on which Genshaft's conclusions are based.

As a matter of law, a defendant is not required to present expert testimony to rebut successfully the plaintiff's expert testimony on an issue in which the plaintiff bears the burden of proof. *Finnegan v. Fred Izenson Co., L.P.A.*, No. 12643, 1991 WL 131687 (Ohio Ct. App. July 18, 1991) (affirming trial court's decision which observed that "the duty to demonstrate an attorney's breach of care through expert testimony is imposed on the plaintiff and not the defendant"); *Reed v. PST Vans, Inc.*, 156 F.3d 1231 (table), 1998 WL 466573 (6th Cir. 1998) (holding that, where a plaintiff presents expert testimony on an essential element of its claim, defendant is not required to present a rebuttal expert in order to "contradict" successfully the

plaintiff's expert testimony).  Rather, in such cases, a rebuttal expert is not necessary where the defendant can refute the plaintiff's expert testimony through cross-examining the expert and presenting independent evidence demonstrating that the expert's opinions were unfounded. *Reed*, 156 F.3d 1231 (table), 1998 WL 466573, at *5 ("In the present case, Defendants contradicted [the expert]'s calculation, both through cross-examination and by presenting evidence of the decedent's consumption. Although Defendants did not present their own expert opinion, such formal contradiction was not necessary. Consequently, the Plaintiff's contention that [their expert]'s testimony was uncontradicted is without merit, and even if the testimony were uncontradicted, the jury was not bound to accept it.").

Here, Defendants do not concede that Lavender breached his duty to Plaintiffs in the course of his representation.  They have sought to undermine Genshaft's conclusions as to malpractice with cross-examination and facts that allegedly contradict Genshaft's underlying assumptions. Moreover, even were Genshaft's testimony as to malpractice uncontradicted, a jury would not be bound to accept it.  Thus, despite Plaintiffs' protestations to the contrary, material facts related to Lavenders' alleged breach of duty in the Meridian Transaction, the Sites Release Agreement, and the CCED Share Acquisition remain in dispute. As such, summary judgment is not appropriate on this basis alone.

Moreover, even if Lavender's breach of duty was uncontroverted, that would not be sufficient to establish a viable claim for legal malpractice under Ohio law.  Rather, to succeed, Plaintiffs must satisfy all essential elements of the claim: (1) an attorney-client relationship such that the attorney owed a duty to the plaintiff; (2) breach of the attorney's duty by not conforming to the standard required by law; and (3) a causal connection between the conduct complained of and resulting damage or loss. *Stancik v. Hersch*, No. 97501, 2012-Ohio-1955, 2012 WL

12

1567213, at *5 (Ohio Ct. App. May 3, 2012) (quoting *Vahila v. Hall,* 674 N.E.2d 1164, 1169 (Ohio 1997)). Plaintiffs' summary judgment motion focuses exclusively on the significance of Genshaft's opinions, which only address the second malpractice element, i.e., failure to conform to the standard of care.  Plaintiffs have not presented to the Court any evidence or argument concerning damages proximately caused by Lavender's conduct in connection with the Meridian Transaction, the Sites Release Agreement, and the CCED Share Acquisition.  Accordingly, Plaintiffs have not met their burden of demonstrating that there is no issue of material fact as to causation.  *See Hartman v. Conseco Senior Health Ins. Co.*, 2010 WL 1981014 (S.D. Ohio May 18, 2010) ("The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact.") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

Plaintiffs' Motion for Summary Judgment is, therefore, **DENIED**.

*B. Defendant's Motion: Statute Of Limitations*

Defendants move for summary judgment on the basis of the statute of limitations as to Plaintiffs' legal malpractice claims arising out of: 1) the Hotwell Transaction; 2) the Meridian Transaction; 3) the Lazear Capital Transaction; and 4) the CCEG Shares Acquisition.  Under Ohio law, an action for legal malpractice must be filed within one year after the cause of action accrues. *See* O.R.C. § 2305.11(A). Here, Plaintiffs' legal malpractice action was filed on January 31, 2011. Thus, in order for Plaintiffs' claims to be viable, they must have accrued no earlier than January 31, 2010.

13

The Ohio Supreme Court has established the following standard for determining when a cause of action for legal malpractice accrues:

> [U]nder R.C. 2305.11(A), an action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later.

*Zimmie v. Calfee, Halter & Griswold*, 538 N.E.2d 398, 401 (Ohio 1989) (citing *Omni-Food & Fashion, Inc. v. Smith*, 528 N.E.2d 941 (Ohio 1988)).  Thus, in deciding whether a malpractice action is barred by the statute of limitations, a court must determine:  (1) when the attorney-client relationship terminated for the particular transaction or undertaking at issue; and (2) when a cognizable event occurred. The later of these two events triggers the running of the statute of limitations. *FDIC v. Alexander*, 78 F.3d 1103, 1107 (6th Cir. 1996) (citing *Zimmie*, 538 N.E.2d at 401).

<u>1. The Hotwell Transaction</u>

Defendants first argue that Plaintiffs' claims arising from the Hotwell Transaction are barred by the statute of limitations.

**a. Termination of Attorney-Client Relationship**

The Court considers first the date on which the attorney-client relationship terminated for the Hotwell Transaction. In Ohio, "for the purposes of the accrual of a legal malpractice claim, an attorney-client relationship ends 'when the attorney-client relationship for that *particular transaction* or *undertaking terminates.*'" *Alexander*, 78 F.3d at 1110 (emphasis original) (quoting *Zimmie*, 538 N.E.2d at 401). In adopting this rule, "[t]he Supreme Court of Ohio … expressly rejected an argument that 'continued 'general' representation should toll the statute of limitations.'" *Id*. (quoting *Omni-Food & Fashion, Inc. v. Smith*, 528 N.E.2d 941, 944 (Ohio

1988)). Thus, under this "particular transaction" rule, the statute of limitations may begin to run as to a particular transaction, even though the attorney may continue to represent the client on other matters. *Id.*; *see also Gatchell v. Lawyer Title Insurance Corporation*, No. 98-AP-1487, 1999 WL 688184 (Ohio Ct. App. Sept. 7, 1999) (holding that, for purposes of the statute of limitations, an attorney's representation of a client regarding preparation of a written mortgage release terminated when the release was signed).

Defendants argue that, for the purposes of evaluating the Plaintiffs' malpractice claims related to the negotiation and drafting of the Hotwell Merger Agreement, Lavender's representation of CCEG ended on December 31, 2008, when the transaction closed. Plaintiffs argue, however, that Lavender's representation relating to the Hotwell Transaction extended until February 2010, when the general attorney-client relationship was terminated. In Plaintiffs' view, but for the Hotwell Transaction, there would have been no need to expend funds to pay the Meridian consultants (resulting in the Meridian Transaction), obtain a short-term line of credit for Hotwell (resulting in the Lazear Capital Transaction), or compensate Joseph Sites (resulting in the Sites Release Agreement). Thus, Plaintiffs reason that – because the Meridian Transaction, the Lazear Capital Transaction, and the Sites Release Agreement all came about in an attempt to "put out fires" caused by the Hotwell merger – all services rendered by Defendants in connection with those matters constitute continuing representation in the Hotwell Transaction.

The applicable case law supports neither of the parties' preferred approaches to determining when representation ends as to a particular transaction. It cannot be that, as a matter of law, representation terminates at the time a transaction closes; indeed, attorneys regularly revisit ostensibly closed transactions to fix mistakes and make alterations. *See*, *e.g., Murphy v. Hyatt Legal Servs.,* No. 16194, 1993 WL 498184, at *3 (Ohio Ct. App. Dec. 1, 1993) (testimony

that attorney was consulted to correct an executed deed created a genuine issue of fact as to whether representation continued with respect to the deed); *Johnson v. Lapin,* No. 3:93–cv–7521, 1995 WL 681102, at *1–3 (N.D. Ohio Oct. 24, 1995) (subsequent consultation regarding suspected problems with a cemetery purchase and the tax status of the cemetery related to the same "particular undertaking or transaction" as the initial purchase).  Nor can it be that representation as to a particular transaction includes every subsequent undertaking that would not have taken place but for the fact of the underlying transaction. Past and present circumstances necessarily impact future courses of action.  Thus, if "but-for" causation alone were sufficient to tie future instances of representation to a prior transaction, the "particular transaction" rule would become a rule of general representation for all practical purposes. Ohio law forbids this result. *See Alexander*, 78 F.3d at 1110 (holding that "continued general representation" does not toll the statute of limitations).

Rather than taking either of the extreme approaches described above, Ohio law charts a more moderate course.  As this Court explained in *Antioch Litigation Trust v. McDermot Will & Emery LLP* ("*Antioch I*"), 738 F.Supp.2d 758, 779 (S.D. Ohio 2010), Ohio courts have held that a "'particular transaction' ... encompasses all dealings related to the proceeding in which the alleged malpractice occurred that are not of a general nature.'" (Quoting *Slavens v. Spetnagel,* No. 95CA769, 1996 WL 422499, at *5 (Ohio Ct. App. July 26, 1996)).  In *Antioch I*, a ruling on motion to dismiss, this Court considered when representation terminated as to a 2003 transaction in which a company, Antioch, was purchased in its entirety by an Employee Stock Ownership Plan ("ESOP").  Rejecting the defendant attorneys' argument that its representation as to the ESOP ended as a matter of law when the ESOP Tender Offer was concluded in December 2003, *Antioch I* explained that – if true – Antioch's allegations that the defendants continued to

16

represent the company in matters related to the ESOP and the Tender Offer between 2004 and 2007 created a genuine issue of fact as to when the attorney-client relationship terminated as to the 2003 ESOP transaction. *Antioch I*, 738 F.Supp.2d at 779.

More recently, in *Antioch Litigation Trust v. McDermot Will & Emery LLP* ("*Antioch II*"), No. 3:09-cv-218, 2013 WL 1338769 (S.D. Ohio Apr. 1, 2013), this Court revisited the matter on a motion for summary judgment. As *Antioch II* explained, in determining whether subsequent work by an attorney tolls the statute of limitations as to a particular transaction, the relevant inquiry is whether that work was "related to" the transaction at issue. *Id*. at *2.  After examining the record, the Court found that the representation as to the 2003 ESOP transaction extended thru April 2004, when attorneys "completed clean-up work on the transaction," including resolving outstanding issues related to the transaction's financing.  *Id*. at * 6.  For subsequent work to satisfy the "'related to' test," however, *Antioch II* explained that the plaintiff needed to allege that its attorneys acted to "fix, alter, or renegotiate the terms of the 2003 ESOP transaction." *Id*. at *7. Employing this approach, the Court concluded that various kinds of subsequent work cited by the plaintiffs – including advising the company as to a potential stock-transfer by a shareholder, amending the company's bylaws, drafting a shareholder resolution, and exchanging notes and warrants issued in the 2003 transaction for tax purposes – were not sufficiently "related to" the 2003 transaction and therefore could not toll the statute of limitations. *Id*. at *5-6.  The Court also found that attorneys' subsequent efforts to find a buyer for the company, recapitalize the company, and ultimately file for bankruptcy were not "related to" the 2003 transaction, despite the fact that attorneys reviewed and considered the 2003 notes and warrants during these undertakings.  *Id*. at *6.

Keeping in mind the lessons of *Antioch I* and *II*, this Court now turns to the question of when Defendants' representation terminated as to the Hotwell Transaction. It is undisputed that representation as to this particular undertaking extended at least until, December 31, 2008, the date the Hotwell Transaction closed. In addition, Plaintiffs present facts which show that Plaintiffs consulted Lavender for several months beginning in January 2009, regarding Hotwell's financials and to discuss CCEG's options under the Hotwell Merger Agreement.  (*See Lavender Emails*, Doc. 60, Ex. 14, 17.) Notably, these consultations considered rights under the existing agreement, and were not for the purposes of "fix[ing], alter[ing], or renegotiate[ing] the terms" of the Hotwell Merger Agreement.  *Antioch II*, 2013 WL 1338769 at *7.  Accordingly, they do not satisfy the "related to" test articulated in *Antioch II*.

Defendants' representation of Plaintiffs with respect to the Meridian Transaction also does not toll the statute of limitations with respect to the Hotwell Transaction. Although Meridian Transaction arose in part as a result of debts incurred by CCEG during the Hotwell Transaction, Defendants' work on the Meridian Transaction was also not concerned with the fixing, altering or renegotiating the terms of the Hotwell Merger Agreement.  Rather, Defendants' actions related to the execution of an assignment agreement, promissory note, and security agreement in favor of Meridian Capital is much like Antioch's 2005 and 2006 exchange of notes and warrants issued in the 2003 transaction – work which the court in *Antioch* found was not related to the initial 2003 ESOP transaction.  *Id.* at *6.  Likewise, here, this Court finds that the Meridian Transaction was not "related to" the Hotwell Transaction for the purposes of tolling the statute of limitations.  Moreover, even if the Court were to find that the June/July 2009 Meridian Transaction did relate to the Hotwell Transaction, such events did not occur within one year of Plaintiffs' January 31, 2011 filing.

18

Similarly, Defendants' work in connection with the Lazear Transaction also does not toll the statute of limitations for the Hotwell Transaction.  In connection with the Lazear Transaction, Defendants represented Plaintiffs in their efforts to secure a buyer to acquire Hotwell's assets and a line of credit that would enable Hotwell to meet its payment obligations while waiting for the sale to close. Thus, even if the motive for this transaction – i.e., Plaintiffs' financial troubles – was rooted in the fall-out from the Hotwell merger, Defendant's work related to Lazear is not properly considered "related to" the Hotwell Transaction.  *See Antioch II*, 2013 WL 1338769 at *6 (finding that, in assisting the company "with effort to find a buyer or to recapitalize the company," defendant attorneys did not do work "related to" to the initial 2003 ESOP transaction).  Furthermore, even if the Lazear Transaction was "related to" the Hotwell Transaction, the Hotwell Transaction predated the Lazear Transaction.  Thus, that would not affect the date the attorney-client relationship terminated.

Finally, Defendant's representation with regard to the Sites Release Agreement does not operate to toll the statute of limitations for malpractice claims arising from the Hotwell Transaction.  Although the work done in connection with the Sites Release Agreement was arguably related to Defendant's representation in the matter of Sites' initial employment agreement, the Sites Release did nothing to "fix, alter, or renegotiate the terms" of the Hotwell Merger Agreement.  *Id*. at *7.

Based on the above analysis, the Court finds that the attorney-client relationship terminated with respect to the Hotwell Transaction on December 31, 2008.

### b. Occurrence of the Cognizable Event

The Court next considers the date on which there was a cognizable event whereby Plaintiffs "discover[ed] or should have discovered that [their] injury was related to [their]

19

attorney's act or nonact." *Zimmie*, 538 N.E.2d at 401. With respect to the Hotwell Transaction, the cognizable event occurred no later than February 28, 2009, when the attorney for Tim Crawford, CCEG's chief executive officer, sent Lavender an email stating his belief that "[t]he Hotwell transaction seems to have been botched." (*Email Corresp*., Doc. 65-26.) In the same email, Tim Crawford's attorney stated: "It appears that the transaction closed without good financials from Hotwell and we don't see any good remedy in the documents for the errors." (*Id*.) Lavender forwarded this email to CCEG's directors, apprising them of the accusations being asserted by Tim Crawford and his attorney. (*Id*.) Thus, irrespective of whether Tim Crawford's attorney was correct in his contention that there wasn't "any good remedy in the documents," it is clear that, at least by February 28, 2009, CCEG had discovered what it believed to be injury arising from Lavender's acts.

Because, here, the cognizable event occurred later in time than the termination of the attorney-client relationship in the Hotwell Transaction, the former triggers the running of the one-year statute of limitations. *Alexander*, 78 F.3d at 1107 (citing *Zimmie*, 538 N.E.2d at 401). Accordingly, Plaintiffs would have been permitted to pursue a claim for legal malpractice arising from the Hotwell transaction had they filed sometime before February 28, 2010. In this case, however, Plaintiffs' legal malpractice claims were not filed until January 31, 2011. Thus, Plaintiffs' claims related to the Hotwell Transaction are, therefore, not timely.

Defendant's motion for summary judgment on Plaintiffs' claims related to the Hotwell Transaction is, therefore, **GRANTED**.

### 2. The Meridian Transaction

Plaintiffs assert a claim for legal malpractice arising from the Meridian Transaction on the basis that the execution of an assignment agreement, promissory note, and security

agreement in favor of Meridian Capital imposed on CCEG and Capital City Petroleum a debt for which they would otherwise not have been liable, and for which they received nothing in return. Defendants assert that Plaintiffs' claims as to the Meridian Transaction are barred by the statute of limitations. Again, under Ohio law, the statute of limitations on an action for legal malpractice runs for one year from the later of: (1) the date on which the attorney-client relationship terminated for the particular transaction or undertaking at issue; or (2) on which a cognizable event occurred. *See* R.C. 2305.11(A); *Zimmie*, 538 N.E.2d at 401.

Defendants argue that the Meridian Transaction was completed at the latest on August 7, 2009, when CCEG's chief financial officer emailed signed copies of the promissory note and security agreement to Lavender. (*Lavender Decl.*, Doc. 65-1, ¶ 34.) Plaintiffs do not offer specific examples of subsequent work done by Defendants related to the Meridian Transaction, but argue that the "Meridian promissory note matter stems from the merger/acquisition as well." (Doc. 69 at 30.) As described at length above, the Hotwell Transaction was a distinct representational matter to which the Meridian Transaction is not related for the purposes of the "particular transaction" analysis. Because Plaintiffs have not proffered evidence that Defendants performed any work *related to* the Meridian Transaction once all the transaction documents were signed and emailed to Lavender, they have failed to establish the existence of a genuine issue of material fact as to the date on which the attorney-client relationship terminated with respect to the Meridian Transaction. *See Antioch II*, 2013 WL 1338769, at *5-7; *Alexander*, 78 F.3d at 1110 (the continuation of a "general [attorney-client] relationship is not …enough to toll the statute of limitations). The Court, therefore, finds that Defendants' representation as to the Meridian Transaction terminated as of August 7, 2009 for the purposes of the statute of limitations.

Defendants argue that the cognizable event also occurred, at the latest, on August 7, 2009, when Doug Crawford emailed Lavender signed copies of the documents that form the basis for Plaintiffs' malpractice claim. Plaintiffs do not proffer an alternative date. As the Sixth Circuit has explained, Ohio law does not require a plaintiff to have actual notice that an attorney's conduct was malpractice. *Alexander*, 78 F.3d at 1107. Rather, "Ohio law requires only '*constructive* knowledge of facts, rather than *actual* knowledge of their legal significance ... to start the statute of limitations running.'" *Id*. (emphasis original) (quoting *Flowers v. Walker,* 589 N.E.2d 1284, 1287 (1992)). Here, the undisputed facts show that Doug Crawford read the Meridian Assignment Agreement, promissory note, and security agreement before signing them. Thus, he knew CCEG had agreed to Consulting Group's assignment of CCEG's debt to Meridian, and also knew that CCEG had pledged its assets, as well as the assets of Capital Petroleum, as security for the debt it owed to Meridian. As such, as of August 7, 2009, Doug Crawford was aware of the matters that CCEG now asserts as the basis for its malpractice claim. This constructive knowledge of facts constitutes the occurrence of a cognizable event.

Because both the termination of the attorney-client relationship as to the Meridian Transaction, and the occurrence of a cognizable event related thereto, took place well over a year before Plaintiffs filed suit on January 31, 2011, Plaintiffs malpractice claims in connection with the Meridian Transaction are not timely. Defendant's motion for summary judgment on Plaintiffs' claims related to the Meridian Transaction is therefore **GRANTED**.

### 3. Lazear Capital Transaction

Plaintiffs' malpractice claim relating to the Lazear Transaction alleges that Lavender was negligent in failing to include a provision in the Lazear security agreement expressly precluding Lazear Capital from foreclosing on and acquiring Hotwell's assets through a private sale.

Defendants assert that this claim, too, is barred by the one-year statute of limitations.  Again, to determine when the statutes of limitations begins to run on Plaintiffs' claim relating to the Lazear Transaction properly accrued, this Court looks to the later of:  (1) the date on which the attorney-client relationship terminated for the particular transaction or undertaking at issue; or (2) the date on which a cognizable event occurred after the cause of action accrues. *See* R.C. 2305.11(A); *Zimmie*, 538 N.E.2d at 401.

Defendants assert that Lavender's attorney-client relationship with CCEG and Hotwell regarding the drafting of the Lazear security agreement terminated on September 15, 2009, when the security agreement was signed and the loan transaction closed. Plaintiffs again implore that the Lazear Transaction was a necessary byproduct of the merger/acquisition and therefore was a mere continuation of Defendant's representation flowing from the Hotwell Transaction.  Once again, Plaintiffs' argument in this regard fails because the Lazear Transaction was not "related to" the Hotwell Transaction for the purposes of tolling the statute of limitations.  In any case, Plaintiffs' attempts to relate the Lazear Transaction back to an earlier transactional representation do not speak to the question of whether Defendants' subsequently did work related to the Lazear Transaction.  In this regard, a review of the record indicates that, after the Lazear security agreement was drafted, Lavender spoke with Doug Crawford regarding Lazear's November 3, 2009 private sale notice.  Construing the scope of the particular transaction broadly, this arguably constituted work related to the Lazear Transaction.  Nevertheless, Doug Crawford has averred that he never asked or directed Lavender or any other attorney to take any time of legal action to challenge Lazear's private sale, either before the sale or afterwards. (*Doug Crawford Decl*, Doc. 64-1, ¶ 28.)  As such, at the latest, the attorney-client relationship as to the Lazear Transaction terminated as of November 3, 2009. *See Antioch II*, 2013 WL 1338769, at *5-7.

With respect to the occurrence of a cognizable event, Plaintiffs knew on November 3, 2009 that Lazear Capital intended to conduct a private sale of Hotwell's assets, and knew on December 3, 2009, that Lazear Capital actually had conducted the private sale. It is that sale that forms the basis for Plaintiffs' malpractice claim regarding the Lazear Transaction. As such, Plaintiffs knew of the factual circumstances giving rise to their claim, at the latest, on December 3, 2009. Accordingly, as of that date, a cognizable event had occurred for the purposes of calculating the statute of limitations period. *See Alexander*, 78 F.3d at 1107 ("Ohio law does not require actual notice that a legal wrong was done. Rather, Ohio law requires only constructive knowledge of facts, rather than actual knowledge of their legal significance . . . to start the statute of limitations running.").

Under Ohio law, the one year statute of limitations begins to run from the later of the above dates – here, December 3, 2009.  Accordingly, Plaintiffs had until December 3, 2010 to make timely a claim for legal malpractice on the basis of Defendants' acts or omissions during the Lazear Transaction.  Because Plaintiffs did not file the matter *sub judice* until on January 31, 2011, Hotwell's claims relating to the Lazear Transaction are barred by the statute of limitations. Defendant's motion for summary judgment on Plaintiffs' claims related to the Lazear Transaction is, therefore, **GRANTED**.

<u>4. CCEG Share Acquisition</u>

Plaintiffs also assert a malpractice claim against Defendant's based on Lavender's acquisition of $275,000 worth of CCEG stock while still representing CCEG.  Defendants' also argue that any claim relating to Lavender's CCEG stock acquisition is barred by the statute of limitations. As noted, to determine the accrual date for legal malpractice claims, this Court looks to the later of:  (1) when the attorney-client relationship terminated for the particular transaction

or undertaking at issue; and (2) when a cognizable event occurred. *Alexander*, 78 F.3d 1103, 1107 (6th Cir. 1996) (citing *Zimmie*, 538 N.E.2d at 401). The later of these two events triggers the running of the one year statute of limitations. *Id.*

The transaction at issue here – the CCEG share acquisition – commenced on May 20, 2008, when Lavender received his stock certificate from the company.  The subsequent cancellation of those shares on May 6, 2009 was necessarily "related to" their initial acquisition. *Antioch I*, 738 F.Supp.2d 758, 779 (a "'particular transaction' ... encompasses all dealings related to the proceeding in which the alleged malpractice occurred that are not of a general nature.") (quoting *Slavens,* 1996 WL 422499 at *5)).  Plaintiffs do not allege that Lavender took any action related to the shares after May 6, 2009. Therefore, that is the date the attorney-client relationship ended relating to this transaction.

As discussed above, a cognizable event occurs when Plaintiffs "discover[ed] or should have discovered that [their] injury was related to [their] attorney's act or nonact." *Zimmie*, 538 N.E.2d at 401. Defendants argue that, because Plaintiffs knew the facts of Lavender's stock acquisition at least from the May 20, 2008 date of issuance, this date constitutes the cognizable event.  Plaintiffs' concerns about the CCEG Stock Acquisition, however, relate also to Lavender's purported failure to pay for the shares as promised – something they would not have known at the time the stocks were issued.  Nevertheless, at the latest, Plaintiffs knew Lavender would not be paying for the shares as of May 6, 2009 – the date of their cancelation.  *Alexander*, 78 F.3d at 1107 ("Ohio law requires only '*constructive* knowledge of facts, rather than *actual* knowledge of their legal significance ... to start the statute of limitations running.'") (emphasis original) (quoting *Flowers,* 589 N.E.2d at 1287).

In light of the above, the statute of limitations on any malpractice claim relating to Lavender's acquisition of CCEG shares expired on May 6, 2010. Plaintiffs did not file the matter *sub judice* until January 31, 2011.  Hence, any malpractice claims relating to the CCEG Shares Acquisition are time-barred.  Defendants' motion for summary judgment on Plaintiffs' claims related to the CCEG Share Acquisition is, therefore, **GRANTED**.

### C. Defendant's Motion: Sites Release Agreement

Plaintiffs also assert that Defendants committed malpractice in failing to review the basis for the release of Sites from his employment agreement with Hotwell in January 2010, which resulted in sights being able to compete with Hotwell in the drilling services business in the Marcellus Shale. Defendants did not argue that Plaintiffs' claims related to the Sites Release Agreement are barred by the statute of limitations.  Rather, Defendants contend that Lavenders' advice with respect to that the Sites Release satisfied Lavender's duty of care, and did not proximately cause any damages.

To succeed on their legal malpractice claims related to the Sites Release Agreement, Plaintiffs must satisfy three essential elements: (1) an attorney-client relationship such that the attorney owed a duty to the plaintiff; (2) breach of the attorney's duty by not conforming to the standard required by law; and (3) a causal connection between the conduct complained of and resulting damage or loss. *Stancik*, 2012 WL 1567213, at *5 (quoting *Vahila,* 674 N.E.2d at 1169). Specifically, here, Defendants dispute that Plaintiffs are able to satisfy the second and third elements of the claim.

### 1. Breach of Duty

Under Ohio law, "the duty an attorney owes to his/her client is the obligation to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal

profession similarly situated." *Stoklosa v. McGill*, No. L-91-028, 1992 WL 32088, at *3 (Ohio

Ct. App. Feb. 21, 1992) (citing *Minick v. Callahan*, 24 O.O.3d 104, 105 (Ohio Ct. App.1980)). In

addition, "the attorney must be ordinarily and reasonably diligent, careful, and prudent in

discharging the duty he/she has assumed." *Id*. (citing *Spangler v. Sellers*, 5 F. 882 (C.C.S.D.Ohio

1881). Significantly, this "ordinary and reasonable" standard does not impose "such higher levels

of care as, *e.g.,* perfect legal knowledge or highest degree of skill." *Id.* (citing *Spangler*, 5 F.

882). The duty of reasonable and ordinary care is breached by an attorney's "failure to provide

competent legal services." *Id*. (quoting *Howard v. Sweeney*, 499 N.E.2d 383, 385 (Ohio Ct. App.

1985)).

Here, the parties vehemently dispute whether, in advising CCEG and Hotwell to release

Sites from his 2008 employment agreement, Lavender performed consistent with his duty of care

as an attorney. The parties do not dispute that, in January 2010, Sites notified Doug Crawford

that CCEG had not paid Sites certain bonuses nor reimbursed him for substantial business

expenses. Sites therefore requested that CCEG either pay Sites what he was owed or release him

from his 2008 employment agreement. In an email to sites and Lavender, Doug Crawford

informed Sites that CCEG "is not in a position to pay for your expenses at this time," and that

"[p]ending any disagreement from Tim [Lavender], I agree … we should release you from the

agreement." Lavender responded to the email, saying: "No – this is a fair accommodation to Joe.

Joe you are still an employee at will for [Hotwell]." (*Lavender Email*, Doc. 61-37.) Lavender

also recommended that the Hotwell/CCEG and Sites execute a joint release. This joint release

was memorialized in two letters dated January 22 and 23, 2010. In addition, allegedly on

Lavender's advice, Doug Crawford sent a letter to Sites dated January 29, which stated that Sites

was released from the restrictive covenant because CCEG "ha[d] not fulfilled its obligations with

27

regard to your employment contract" due to: 1) failure to pay 2008 bonuses totaling $18,734.87; 2) failure to reimburse business expenses totaling $33.025,06; and 3) failure to repay a September 14, 2009 loan from Sites in the amount of $50,000. (*Todd Crawford Aff.*, Doc. 68, Ex. 7.)

Under Ohio law, "a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract." *Jackson v. State Farm Fire & Cas. Co.,* 461 Fed. Appx. 422, 426 (6th Cir. 2012). Defendants argue that, in advising CCEG to release Sites, Lavender understood that CCEG and Hotwell were in breach of Sites' release agreement and were by law prohibited from enforcing Sites' restrictive covenants. Thus, Lavender knew that, by releasing Sites, CCEG and Hotwell weren't giving anything away. Defendants also argue that, by recommending a joint release, Lavender relieved CCEG and Hotwell from any contractual obligation to pay Sites his unpaid business expenses or any severance benefits that might be due if the companies terminated Sites' employment in the future.

Plaintiffs do not dispute that a material breach might have rendered unenforceable the restrictive covenants from which Sites was released.  (*See Genshaft Expert Rep.*, Doc. 60-19, 14) ("If the failure of CCEG to pay Sites money that it owed him was a material breach of the agreement, Ohio case law provides that the contract, with its restrictive covenants, may not have been enforceable by CCEG.") (citing *Hanna v. Groom*, 2008-Ohio-765 (Ohio Ct. App. Feb. 26, 2008)). Nor do they dispute that that Sites' 2008 employment contained an express term obligating CCEG and Hotwell to reimburse Sites for all reasonable business expenses he incurred.  Plaintiffs have, however, presented evidence that the bonus and the $50,000 loan were governed by separate agreements, and were *not* terms or conditions of 2008 employment

agreement.  Thus, plaintiffs argue, any failure to pay bonuses or repay the loan would not have constituted breach of the employment agreement.  In addition, plaintiffs have proffered evidence that CCEG and Hotwell had arranged to satisfy all outstanding payment obligations to Sites as part of the Lazear's acquisition of Hotwell, and that Lavender (who had drafted all the documents for the Lazear Transaction) knew this to be the case. Thus, Plaintiffs argue, any breach of contract would shortly have been cured.

Plaintiffs also fault Lavender's conduct in this matter as lacking the thought and analysis that comports with an attorney's duty of care.  As evidence of this, Plaintiffs' offer the report of their expert, who – after reviewing the facts – concluded:

> Thus, I believe it was premature for Lavender to advise CCEG that it should release Sites of his post-employment covenants in exchange for a release by Sites of certain expenses due him. Sites was a very valuable employee to Hotwell, and it should have been very clear to lavender that Sites' ability to compete with Hotwell would be extremely detrimental to the company.  Therefore, more though and analysis should have gone into the matter before Lavender recommended that CCEG release sites from his covenant not to compete with Hotwell.

(*Genshaft Expert Rep.*, Doc. 60-19, 15)  Moreover, in Plaintiffs' view, Lavender's cavalier approach to the Sites Release reflects not only negligence, but an active alliance with Sites – the adverse party in this transaction. In support, Plaintiffs' point to the fact that Lavender's response to Doug Crawford's inquiry referenced only that a release was a "fair accommodation to Joe." In addition, Plaintiffs also present evidence which tends to show that, after Lavender had withdrawn as counsel for the company, Lavender provided legal advice *to Sites* regarding terminating his employment relationship with CCEG and Hotwell. (*See e.g., Lavender Email to Sites*, Doc. 61-39) ("Joe –You had an employment agreement which contained restrictive covenants, but equally required [CCEG] and [Hotwell] to perform, namely pay you a salary,

bonus, repay you for your company expenses incurred by you during the term of the agreement and other benefits.").

Based on the record above, the Court finds that there is a genuine dispute of material fact as to whether Lavender's conduct in connection with the Sites Release evinced the "ordinary and reasonable" diligence, carefulness, and prudence which an attorney's duty of care requires in the course of representation. *Stoklosa*, 1992 WL 32088, at *3 (citing *Spangler*, 5 F. 882).

### 2. Proximate Cause of Damages

To satisfy the proximate causation requirement of a malpractice claim, "the plaintiff must show that, but for the attorney's negligence, the plaintiff would be in a more favorable position, *i.e.,* once again that the plaintiff had a valid claim or defense." *Stoklosa*, 1992 WL 32088, at *3 (citing *Howard*, 499 N.E.2d at 385) ("In proving damages the plaintiffs must be able to prove that the original claim would have been successful had the attorney not been negligent."). In general, "[t]he issue of proximate cause is … a question of fact and is therefore a matter for the jury." *Morris v. Morris*, Case No. 21350, 2003 Ohio 3510, 2003 WL 21509023  (Ohio Ct. App. Jul. 2, 2003) (citing *Farlow v. Board of County Cmmrs.*, 9th Dist. Nos. 2812, 2813, at 11 (Ohio Ct. App. Apr. 18, 1979); *Platinum Fin. Servs. v. Gurney*. 69481, 1996 Ohio App. LEXIS 4802, at *29 (Ohio Ct. App. Oct. 31, 1996)).

Plaintiffs contend that Lavender's breach of duty with respect to the Sites Agreement caused CCEG and Hotwell damages by enabling Sites – with his vast knowledge and industry contacts – to go to work for one of Hotwell's competitors.  The undisputed facts of record reflect that, after the Sites Release was executed, Sites remained with Hotwell for a time as an at will employee.  Subsequently, on March 15, 2010, Sites gave written notice that he would be resigning from Hotwell effective March 31, 2010.  Upon receiving Sites' letter CCEG sent Sites

a letter purporting to terminate him for cause under his employment agreement. In that letter, CCEG took the position that Sites was still bound by the non-compete and other restrictive covenants contained in the employment agreement. Sites subsequently went to work for one of Hotwell's competitors.

In response to his termination, Sites filed an action in the Common Pleas Court of Stark County, Ohio, seeking a declaration that his employment agreement with CCEG and Hotwell was unenforceable because of the joint release. Alternatively, Sites sought a declaration that his employment agreement was unenforceable because the companies were in breach of the agreement as a result of their failure to pay him his 2008 bonus and to reimburse his business expenses. CCEG and Hotwell filed a counterclaim for breach of contract, asserting that Sites had violated the non-compete and other restrictive covenants in his employment agreement by working for a competitor of Hotwell and soliciting Hotwell's employees and customers. CCEG also sought a declaratory judgment that the Sites Release was invalid. Ultimately, Sites, CCEG and Hotwell settled and, as part of the settlement, Sites' new employer agreed to pay CCEG and Hotwell $100,000. (*Todd Crawford Depo.*, Doc. 60-1, 120 and Exs. 14,15; *Tim Shear Depo.*, Doc. 60-11, 63-64 and Exs. 10, 11.)

Defendants argue that Plaintiffs cannot here demonstrate proximate cause for two reasons. First, Defendants argue that, even in the absence of the Sites Release, Plaintiffs would not have been able to enforce the employment agreement because CCEG and Hotwell were in material breach of the agreement by failing to satisfy their financial obligations thereto. As the Court discussed above, there disputed questions of material fact as to whether CCEG and Hotwell had actually materially breached the agreement.

Second, Defendants argue that Lavender's acts or omissions were not the proximate cause of any losses sustained by CCEG and Hotwell because those parties were "the ones who voluntarily decided to settle their litigation against Joseph Sites rather than continuing to pursue it." (*Def.'s Mt.*, Doc. 66, 43.)  Plaintiffs counter that they opted to settle because Defendants' negligence left Sites with two "very viable arguments that the restrictive covenants were not enforceable," namely: 1) the loophole in the initial drafting of the employment agreement that permitted Sites to avoid the restrictive covenants if he resigned voluntarily; and 2) the Sites Release.  (*Pl.'s Response*, Doc. 69, 24).

If Plaintiffs are able to prove that Lavender was negligent in drafting the initial employment agreement and advising Plaintiffs as to the Sites Release, they will be in a position to show that " but for the attorney's negligence, the plaintiff would be in a more favorable position." *Stoklosa*, 1992 WL 32088, at *3 (citing *Howard*, 499 N.E.2d at 385).  Defendants cite to no authority, and the Court knows of none, which stands for the proposition that Plaintiffs were required to pursue a fatally compromised action to fruition in order to sustain malpractice claims against the compromising attorneys.  The question is not whether Plaintiffs *did* succeed in their claims against Sites, but rather whether Plaintiffs can prove that they *would* have succeeded, but for Defendants' negligence. *See Howard*, 499 N.E.2d at 385 ("[I]n proving damages the plaintiffs must be able to prove that the original claim would have been successful had the attorney not been negligent.") (citing *Belfer v. Spiegel*, 480 N.E.2d 825 (Ohio Ct. App. June. 29, 1984)). If Plaintiffs are able to prove that they could have otherwise enforced the restrictive covenants against Sites, the sole potential impact of the Sites settlement on a damages/proximate cause analysis would be to reduce Plaintiffs' injury by $100,000. The Court

therefore finds that a genuine issues of material fact exists as to whether Defendants' acts or non-acts were the proximate cause of Plaintiffs' damages.

Based on the foregoing, Defendant's motion for summary judgment on Plaintiffs' legal malpractice claim related to the Sites Release is **DENIED**.

## V. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is **DENIED** and Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Court Judge**

**DATED:  September 27, 2013**